E-FILED
Thursday, 11 February, 2010 02:39:55 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CARTER McEUEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3172 |
| | ) | |
| LOWER ILLINOIS TOWING CO., | ) | |
| CARGILL INCORPORATED, | ) | |
| AMERICAN COMMERCIAL BARGE | ) | |
| LINE, LLC, and | ) | |
| AMERICAN COMMERCIAL | ) | |
| LINES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This cause is before the Court on Defendant Cargill Incorporated's Motion for Summary Judgment (d/e 27) and Amended Motion for Summary Judgment (Cargill's Motion) (d/e 29); and Defendants American Commercial Barge Line, LLC and American Commercial Lines, Inc.'s Motion for Summary Judgment as to Count V of Plaintiff's First Amended Complaint (ACL's Motion) (d/e 33 and d/e 39). Plaintiff Carter McEuen has filed Plaintiff's Memorandum in Opposition to Cargill Incorporated's

Motion for Summary Judgment (Response to Cargill's Motion) (d/e 31) and Plaintiff's Response to Defendants American Commercial Barge Line, LLC and American Commercial Lines, Inc.'s Motion for Summary Judgment (Response to ACL's Motion) (d/e 35).[1]  Defendant Cargill Incorporated (Cargill) then filed its Reply to Plaintiff's Response to Motion for Summary Judgment (d/e 32).

This matter is fully briefed and ripe for adjudication.  For the reasons described below, Cargill's Motion is granted in part, and denied in part. ACL's Motion is granted.

APPLICABLE LAW

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex

---

[1]American Commercial Barge Line, LLC and American Commercial Lines, Inc. filed two motions for summary judgment.  The first, at Docket Entry 33, was directed at Plaintiff's original Complaint (d/e 1), and the second, at Docket Entry 39, is directed at Plaintiff's First Amended Complaint (d/e 37).  Technically, Defendants did not need to file the more recent Motion because in it they only seek summary judgment on Count V, and as the Court's Order of January 8, 2010, makes clear, the pending summary judgment motions pertaining to Counts I through V of the original Complaint were deemed still pending after Plaintiff filed the First Amended Complaint.  See Text Order of January 8, 2010.  Because the Motions are substantively identical, the Court deems Plaintiff's Response to the first Motion to be his Response to the second Motion.

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Herman v. Nat'l Broadcasting Co.</u>, 744 F.2d 604, 607 (7th Cir. 1984).  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  A court properly enters summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322; <u>see McKenzie v. Illinois Dept. of Transp.</u>, 92 F.3d 473, 479 (7th Cir. 1996) (quoting <u>Celotex</u>).  The court does not resolve disputed factual issues, but rather determines whether "there is a genuine issue for trial."  <u>Blaguss Travel Int'l v. Musical Heritage Int'l</u>, 833 F.Supp. 708, 710 (N.D. Ill. 1993).

To successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts.  <u>See</u> <u>Zenith</u>, 475 U.S. at 586.  Instead, he must present "specific facts showing a genuine issue for trial."  <u>Fed. R. Civ. P.</u> 56(e)(2); <u>Zenith</u>, 475

U.S. at 587 (emphasis omitted).  There is not a genuine issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ."  <u>Zenith</u>, 475 U.S. at 587.

FACTS

Plaintiff Carter McEuen is a seaman who was injured on August 24, 2005, while opening a roll-top barge cover on the Illinois River in Florence, Illinois.  Plaintiff was a deckhand aboard the "M/V Tom Edwards," a tugboat owned and operated by Defendant Lower Illinois Towing Company (Lower Illinois).[2]  Lower Illinois  was Plaintiff's employer.  The captain of the "Tom Edwards" was Philip McEuen, Plaintiff's brother.  At the time of the events alleged in the Complaint, Plaintiff had nearly twenty years of experience as a seaman.

Part of Lower Illinois' business was switching, cleaning, and fleeting barges for Defendant American Commercial Barge Lines, LLC (ACBL).[3]

---

[2]The prefix "M/V" stands for "motor vessel."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1493 (1986).  A tugboat is a powerful vessel used to tow or push larger vessels, like barges, through a waterway.  <u>Id.</u> at 2461.  A barge is a flat-bottomed vessel used to transport freight or passengers; typically, it is not self propelled.  <u>Id.</u> at 176.

[3]Defendant American Commercial Lines, LLC (ACL) is Defendant ACBL's successor in interest; American Commercial Lines, Inc. is ACBL's and ACL's parent company and has no employees.  Some time after the events alleged in the Complaint, ACL assumed all of ACBL's assets and liabilities, and ACBL ceased operating.  <u>ACL's</u>

4

Lower Illinois also occasionally performed work for Defendant Cargill, including opening roll-top covers on barges at the grain elevator when Cargill was busy, or when Cargill personnel had trouble rolling the covers themselves.  Lower Illinois billed Cargill directly for these services.  <u>Cargill's Motion</u>, Ex. B, <u>Deposition of Philip McEuen (Philip McEuen Dep.)</u> 21:20-21.  On August 24, 2005, ACBL owned Barge 3272 (the Barge), which was docked for loading at Defendant Cargill's grain elevator on the Illinois River in Florence, Pike County, Illinois.

Roll-top, or telescoping, barge covers are made of steel and are set into tracks with wheels, allowing them to roll along rails on the barge and telescopically retract.  The covers are held down by latches and pins, which must be flipped up before the covers are opened.  The whole apparatus fits over the barge's coaming, a high wall surrounding the opening for the cargo box.  The covers have lift rings mounted to their centers so that an individual can attach a cable or line to the cover, and then attach that line either to a winch or a tugboat, which then pulls back the cover.  This person often accesses the covers by using running ladders, which are attached to the barge's bow and stern ends, or by climbing up the coaming wall's exterior

---

<u>Motion</u>, Ex. A, <u>Affidavit of Mary Ann Guenther</u>, ¶¶ 1-2, 4-5.

frame.  In some instances, though, there are gaps between the covers, making them inaccessible from the barge's ladders.

Roll-top barge covers can be problematic for a number of reasons.  The covers sometimes come out of the tracks, making them difficult to roll and causing them to get stuck.  <u>Philip McEuen Dep.</u> 23: 7-15; <u>Response to Cargill's Motion</u>, Ex. 1, <u>Deposition of William Booth (Booth Dep.)</u> 26:1-7; <u>Response to Cargill's Motion</u>, Ex. 2, <u>Deposition of William Freesmeyer (Freesmeyer Dep.)</u> 8:5-21.  On other occasions, the pins that hold the covers into place fall down while the covers are being retracted, making them stop in their tracks.  <u>Philip McEuen Dep.</u> 23:7-15, 24:12-23; <u>Booth Dep.</u> 26:1-7; <u>Cargill's Motion</u>, Ex. A, <u>Deposition of Carter McEuen (Carter McEuen Dep.)</u> 81-84.

On August 24, 2005, Plaintiff and his brother Philip McEuen were the only crew-members aboard the "Tom Edwards."  Cargill enlisted Lower Illinois' services to open the roll-top covers on the Barge so that the cargo box could be filled with grain.  Initially, the Barge was positioned with its bow facing downstream, or south.[4]  The "Tom Edwards" was positioned on

_____

[4]The bow is the front of a vessel, while the stern is its back.  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 261, 2239 (1986).

the port side of the Barge.[5]   Plaintiff testified at his deposition that the Barge had ten covers, which retracted from bow to stern end.   Plaintiff rolled the first eight covers by unlatching the pins that held the covers in place, and attaching a cable to the lift ring on the far bow-end cover.   He then threw the line to Philip McEuen on the tugboat, which traveled upstream, or north, to retract the first eight covers.   Although Plaintiff noted that one of the covers seemed off-track, all eight covers rolled back, exposing half of the cargo box for loading.   Cargill employees then secured the roll covers with a chain so that they would not move during the loading process.

The "Tom Edwards" returned to the Barge nearly three hours later, after Cargill personnel had loaded half of the Barge with corn, starting at the bow end.   One by-product of the loading process was grain dust, which accumulated on the deck as the cargo hold was filled with corn.   Plaintiff testified at his deposition that the amount of grain dust on the Barge on August 24, 2005, was what he would generally expect.   Carter McEuen Dep. 145:5-7.   Plaintiff stated that the grain dust should be swept from the Barge when it was finished being loaded.   Id., 145: 9-11.   He stated that there was

---

[5]The port side of a vessel is its left side, from the perspective of a person facing the bow.   WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1768 (1986).   The starboard side is the right side.   Id. at 2226.

a broom aboard the "Tom Edwards," and that Plaintiff would sweep the deck if he felt that the volume of grain dust on the deck made conditions unsafe. Id., 144:14-21. Long-time Cargill employee William Booth testified that in 2005 Cargill cleaned the barges after they were finished being loaded. Booth Dep. 31:12-20.

Plaintiff and Philip McEuen prepared to close the covers over the half of the Barge that had been filled, and open the remaining covers. However, during the process one of the covers split, and the covers "hung up," or got stuck. Plaintiff's investigation revealed that one of the covers was off track. Booth said that steel roll-top covers often got stuck, either because they were off track, or because a dropped pin prevented the cover from rolling smoothly. Booth Dep. 26:1-7.

Plaintiff went to the stern end of the Barge, climbed over the coaming onto the stuck cover, and attached a cable to the lift ring using the same type of hook-and-shackle device he had used earlier in the day to roll the covers from the bow end of the Barge. He climbed down from the cover onto the deck. Although Plaintiff had asked Cargill personnel to borrow a stepladder in the past, Plaintiff did not do so on this occasion. Plaintiff

then attached an additional line to a kevel[6] on the "Tom Edwards," and climbed back onto the cover closest to the Barge's stern end to attach the leaving line to the lift ring on one of the covers further toward the bow end, hoping that this would rectify the problem and loosen the cover that was stuck. As Plaintiff was climbing down from this cover, he placed his right foot on a kevel and slipped. Plaintiff felt his knee pop.

Despite his knee injury, Plaintiff and his brother finished rolling the covers, and then returned later in the day to close all of the covers after Cargill filled the other half of the Barge with corn. However, the next day Plaintiff's knee began bothering him. He went to the doctor a few days later, and ended up having to have at least two surgeries to correct a tendon tear.

Plaintiff filed his five-count Complaint in this suit on August 6, 2008, and later his First Amended Complaint to add a general maritime negligence count against ACBL and ACL. Plaintiff directs Counts I and II against Lower Illinois; he brings Count I under the Jones Act, and Count II for maintenance and cure. Count III is an unseaworthiness claim, and Count

---

[6]A kevel is an anvil-shaped cleat used to secure a line. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1239 (1986).

IV is a general maritime negligence claim, both against Cargill.  Counts V and VI are, respectively, seaworthiness and maritime negligence claims against ACBL and ACL.[7]

ANALYSIS

This case arises under this Court's jurisdiction over cases involving admiralty, or maritime, law.  See U.S. Const. art. III, § 2 ("The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction. . . ."); 28 U.S.C. § 1333(1).  Defendants Cargill, ACBL, and ACL argue that they are entitled to summary judgment on various grounds.  The Court will first address Cargill's Motion, and will then discuss ACL's Motion.

## I.   CARGILL'S MOTION FOR SUMMARY JUDGMENT

Defendant Cargill presents separate arguments for summary judgment on Counts III and IV.  The Court will address each argument in turn.

### A.   Count III: Unseaworthiness

Cargill first argues that Plaintiff cannot sustain an unseaworthiness claim against it because Cargill neither owned nor chartered the Barge in question.  Plaintiff admits that Cargill did not own the Barge, but instead

---

[7]ACL's Motion seeks summary judgment only on the seaworthiness claim in Count V of the First Amended Complaint.

argues that Cargill owed him a duty of seaworthiness by virtue of its use and control of the Barge.

The doctrine of seaworthiness imposes an absolute, non-delegable duty resulting in strict liability for any injuries caused by a vessel's unseaworthiness. Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 904 (6th Cir. 2006); McAleer v. Smith, 57 F.3d 109, 112 (1st Cir. 1995); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 (1946), *superseded by statute on other grounds*, Longshoremen's and Harbor Worker's Compensation Act, § 1, 86 Stat. 1251, 1251-65 (1972) (current version at 33 U.S.C. §§ 901 et seq. (West 2010)), *as recognized in* Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 262 (1979); Mahnich v. Southern Steam Ship Co., 321 U.S. 96, 102 (1944); see ROBERT FORCE, ADMIRALTY AND MARITIME LAW 99 (Fed. Judicial Ctr. 2004).  This duty requires that a vessel and its appurtenances be "'reasonably fit for their intended use.'" Churchwell, 444 F.3d at 904 (quoting Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960)); see Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001) ("Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea.").

11

The duty to provide a seaworthy vessel is imposed only on the vessel's owner, or the vessel's owner pro hac vice.  Mahnich, 321 U.S. at 103-04; Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330, 332 (5th Cir. 1993); see FORCE, 99.  An owner pro hac vice is an individual "who stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel." Matute v. Lloyd Bermuda Lines, Ltd., 931 F.2d 231, 235 n.2 (3rd Cir. 1991) (quoting Aird v. Weyerhaeuser S.S. Co., 169 F.2d 606, 610 (3rd Cir. 1948)).   The vessel's owner is absolved of liability for an unseaworthy vessel only if there is an owner pro hac vice, and if the condition causing the injury did not exist prior to the owner pro hac vice taking control of the vessel.  McAleer, 57 F.3d at 112; Ramos v. Beauregard, Inc., 423 F.2d 916 (1st Cir. 1970).

For purposes of the case at bar, the only way in which a party can acquire status as an owner pro hac vice is if that party is a demise, or bareboat, charterer.  McAleer, 57 F.3d at 112-13; see Baker v. Raymond Int'l, Inc., 656 F.2d 173, 181-82 (5th Cir. 1981).  A demise charter "constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer . . . ."  Baker, 656 F.2d at 182.  A

demise charterer is "one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof . . . ." Matute, 931 F.2d at 935. A demise charter is "therefore tantamount to, though just short of, an outright transfer of ownership." Guzman v. Pichirilo, 369 U.S. 698, 700 (1962).

Anything less than such a transfer is considered a time, or voyage charter, which is a contract "not for the vessel itself but for a specific service of the vessel, such as transport of goods, which is rendered by the owners' ship, captain, and crew." Matute, 931 F.2d at 935. The fact that a time charterer "has some control over the master [or] selects the routes to be taken or the cargo to be carried does not make [it] the owner Pro hac vice." Stephenson v. Star-Kist Caribe, Inc., 598 F.2d 676, 681 (1st Cir. 1979). Time and voyage charterers cannot be held liable for a vessel's unseaworthiness. McAleer, 57 F.3d at 113; Baker, 656 F.2d at 182.

Here, Plaintiff's unseaworthiness claim against Cargill sinks or swims on the issue of whether Cargill was an owner pro hac vice of the Barge, because the undisputed material facts demonstrate that ACL, not Cargill, owned the Barge. The undisputed material facts also show that Cargill was not a demise charterer of the Barge. ACL delivered the Barge to Cargill so

that Cargill could load the Barge with grain.  After Cargill loaded the Barge,

Lower Illinois returned the Barge to its fleet, and an ACL towboat

transported the Barge for final delivery.  These terms are consistent with a

time or voyage charter, because Cargill only used the Barge for "a specific

service," see Matute, 931 F.2d at 935, and did not assume exclusive

"possession, command, and navigation," see Guzman, 369 U.S. at 699.

This conclusion is bolstered by ACL's corporate counsel's answers to

Cargill's Interrogatories:

> 4.   Identify the owner and operator of Barge ACBL 3272 at
>       the time of the accident alleged in Plaintiff's Complaint,
>       and identify all documents reflecting ownership and the
>       current custodian of each such document.
>
> **ANSWER:** See Certificate of Documentation produced in
> response to the request for production of documents (00018).
>
> 5.   State whether Barge ACBL 3272 was chartered to any
>       other party at the time of the accident alleged in Plaintiff's
>       Complaint.  If so, state to whom it was chartered, the
>       dates of the charter and its terms, and identify any
>       documents that evidence such a charter, and identify the
>       current custodian thereof.
>
> **ANSWER:** N/A.

Cargill's Motion, Ex. D., Answers to Interrogatories.  The document

identified in Answer 4 is the Barge's Certificate of Documentation issued by

the U.S. Coast Guard, showing ACL as sole owner of the Barge.  Cargill's Motion, Ex. E, Certificate of Documentation.  Cargill did not own or operate the boat on August 24, 2005, and, by ACL's own admission, Cargill was not a demise charterer, and by extension not an owner pro hac vice of the Barge.  Therefore, Cargill did not owe Plaintiff a duty of seaworthiness.

Plaintiff argues that "Cargill had *use and control* of the [B]arge" when Plaintiff was injured.  Response to Cargill, p. 6.  However, Plaintiff has not provided the Court with any authority supporting the assertion that "use and control" of a vessel are sufficient to transform the user into an owner pro hac vice.  While Plaintiff is correct that the warranty of seaworthiness "imposes a nondelegable duty on a vessel owner or operator," in this case ACL has admitted that it, and not Cargill, was the owner and operator of the Barge on the date in question.  See Yoash v. McLean Contracting Co., Inc., 907 F.2d 1481, 1487 (4th Cir. 1990).[8]  Plaintiff's argument is therefore

---

[8]The only other case Plaintiff cites is from the Supreme Court of Oregon.  See May v. Chicago Ins. Co., 490 P.2d 150 (Or. 1971).  May was a suit for declaratory relief brought by parties seeking coverage under a marine insurance policy, and as such is inapposite to the case at bar.  The May Court's statement that "the operator of a vessel is the entity which has the use and control of that vessel," id. at 156, is of little persuasive value when, as here, the overwhelming weight of federal authority discussing the contours of the warranty of seaworthiness makes clear that only owners or owners pro hac vice have a duty to provide a seaworthy vessel, see, e.g., Guzman, 369 U.S. at 699-700; Florida Fuels, 6 F.3d at 332; Baker, 656 F.2d at 181-82.

unavailing.

Finally, even if the Court assumes <u>arguendo</u> that Cargill was an owner <u>pro</u> <u>hac</u> <u>vice</u> of the Barge, Cargill would still be entitled to summary judgment on Count III because the duty of seaworthiness extends only to crew members, and Plaintiff was not a member of the Barge's crew. "[A] Jones Act seaman, who possesses the full range of traditional seamen's rights and remedies, cannot maintain a [] seaworthiness action against a vessel on which he is not a crew member." <u>Smith v. Harbor Towing & Fleeting, Inc.,</u> 910 F.2d 312, 315 (5th Cir. 1990); <u>see</u> <u>River Transp. Assocs.v. Wall</u>, 5 F.3d 97, 100 (5th Cir. 1993); <u>Weathers v. Triple M Transp., Inc.,</u> 2006 WL 897651 (E.D. Ark. Mar. 31, 2006); <u>Coakley v. SeaRiver Maritime, Inc.,</u> 319 F.Supp.2d 712, 7126 (E.D. La. 2004); <u>Speer v. Taira Lynn Marine, Ltd., Inc.,</u> 116 F.Supp.2d. 826, 830 (S.D. Tex 2000); <u>Corrigan v. Harvey</u>, 951 F.Supp. 948, 952 (D. Haw. 1996).

Plaintiff was an employee of Lower Illinois and a crew-member of the "Tom Edwards." He was not ACL's employee, and was not a crew member of the Barge. Even if Cargill was an owner <u>pro</u> <u>hac</u> <u>vice</u> of the Barge, it would still be entitled to summary judgment on Plaintiff's seaworthiness claim.

Accordingly, the Court grants Cargill summary judgment on the unseaworthiness claim in Count III of the Complaint.

B.  <u>Count IV: Maritime Negligence</u>

Cargill next argues that it is entitled to summary judgment on Plaintiff's negligence claim because it did not owe Plaintiff a duty of care. Plaintiff counters that Cargill owed him a duty because: (1) Cargill knew that the roll-top covers were problematic; (2) it was reasonably foreseeable that Plaintiff would have to climb on top of the covers because certain covers were not accessible by ladder; and (3) Cargill was responsible for preventing grain dust from accumulating on the Barge's deck.

The elements of a maritime negligence cause of action are the same as those of a general negligence claim.  <u>Evergreen Int'l, S.A. v. Norfolk Dredging Co.</u>, 531 F.3d 302, 308 (4th Cir. 2008); <u>Consolidated Aluminum Corp. V. C.F. Bean Corp.</u>, 833 F.2d 65, 67 (5th Cir. 1987); <u>see</u> <u>Folkstone Maritime, Ltd. V. CSX Corp.</u>, 64 F.3d 1037, 1046-47 (7th Cir. 1995).  A plaintiff must establish that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the breach of duty caused the plaintiff's injury; and (4) the plaintiff sustained damages.  <u>Jones v. Chicago HMO Ltd. of Illinois</u>, 730 N.E.2d 1119, 1129 (Ill. 2000); 57A Am. Jur. 2d

Negligence § 71 (2009).

The duty in a maritime negligence case is one "of exercising reasonable care under the circumstances . . . ." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959).  The question of whether the defendant owes the plaintiff a duty is a question of law for the court.  Fulk v. Illinois Cent. R. Co., 22 F.3d 120, 125 (7th Cir. 1994); Consolidated Aluminum 833 F.2d at 67.  In answering that question, the Court evaluates: (1) the foreseeability of the injury; (2) the likelihood that the injury would occur; (3) the burden on the defendant in protecting against the injury; and (4) "'the consequences of placing that burden on the defendant.'" Camp v. TNT Logistics Corp., 553 F.3d 502, (7th Cir. 2009) (quoting City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099, 1124 (Ill. 2004); see Staples v. Krack Corp., 186 F.3d 977, 979 (7th Cir. 1999); Consolidated Aluminum 833 F.2d at 67.  An injury is foreseeable if "harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." Consolidated Aluminum, 833 F.2d at 68; see In re Signal Int'l, LLC, 579 F.3d 478, 491 (5th Cir. 2009).

The Court, viewing the evidence in the light most favorable to Plaintiff, as it must at the summary judgment stage, finds that Cargill owed Plaintiff a duty to exercise reasonable care.  Cargill was loading the Barge with grain at its grain elevator at the time of Plaintiff's injury.  Cargill hired Plaintiff's employer, Lower Illinois, to open the roll-top covers on the Barge on August 24, 2005.  Philip McEuen testified that Cargill was billed and paid for these services.  Cargill, by virtue of hiring Lower Illinois to roll the covers on the Barge, knew that Lower Illinois personnel would have to board the Barge and climb atop the covers in order to roll them.  It was reasonably foreseeable that someone like Plaintiff could injure himself while in the process of rolling the covers.  Cargill had a duty to keep the Barge in a reasonably safe condition while Cargill loaded it.

Cargill relies on Pledger v. Phil Guilbeau Offshore, Inc. to avoid this conclusion.  In Pledger, the plaintiff sued a variety of defendants after he slipped and fell on algae that had grown on the deck of a tug boat.  Pledger v. Phil Guilbeau Offshore, Inc., 2003 WL 2012382, at * 1 (E.D. La. May 1, 2003).  At the time of the accident, the plaintiff's employer, Halliburton Energy Service, Inc., was providing services for another one of the defendants, Stone Energy, on an oil well in the Gulf of Mexico.  Id.  The oil

well company had chartered a utility boat from a third defendant for use by the Halliburton employees.  One day, a Stone Energy representative asked plaintiff's crew to backload their equipment after they finished working for the day.  A Halliburton employee thought that it would be safe for them to do so, despite high winds and bad sea conditions.  Id.  Prior to backloading the equipment, the plaintiff and his crew held a safety meeting and discussed the fact that the decks were slippery due to algae.  Nonetheless, during the backloading operation the plaintiff slipped and fell, injuring himself.

Stone Energy moved for summary judgment, arguing that it did not owe the plaintiff a duty of care because it did not know of the algae on the deck of the utility boat, and because no one had informed its representative that conditions were too dangerous to backload the equipment.  Id. at *6.  The court granted Stone Energy's request, finding first that, by the plaintiff's own admission, it was the algae, not sea conditions, that caused his injury.  The Pledger Court then determined that Stone Energy could not have foreseen that the plaintiff would slip on the algae because Stone Energy had no knowledge of the condition, and therefore the company did not owe the plaintiff a duty of care.  Id. at *7.

Pledger is easily distinguishable from the case at bar. Stone Energy's actions did not cause the algae to grow on the utility boat's deck, and it did not know that the algae were there. In this case, though, Cargill knew that grain dust accumulated on the decks of barges during the grain-loading process; in fact, by loading the Barge with grain, Cargill created the grain dust that allegedly caused Plaintiff to slip on the kevel and injure himself. Additionally, Cargill knew that oftentimes deckhands would climb the coaming frame instead of using one of the ladders mounted at the bow and stern end of the barges. Unlike Stone Energy, Cargill had knowledge of the conditions that allegedly caused the Plaintiff's injury. Therefore, the Pledger Court's reasoning does not apply to this case.

The Court notes that there is evidence that it was common practice in the industry for deckhands to climb on top of the covers using the exterior frame of the coaming wall, as opposed to a ladder. Likewise, Carter McEuen, Philip McEuen, and Bill Booth testified that it was not common industry practice to sweep the deck until all of the grain had been loaded, and Plaintiff indicated that the amount of grain dust on the Barge was fairly normal. However, merely complying with industry custom is not a defense to negligence. U.S. Fidelity & Guar. Co. v. Jadranska Slobodna Plovidba,

21

683 F.2d 1022, 1028 (7th Cir. 1982); see The T.J. Hooper, 60 F.2d 737, 740 (2nd Cir. 1932) ("Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure . . . ."); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 13(a). There is a question of fact regarding whether Cargill's conduct was reasonable under the circumstances, and therefore summary judgment is inappropriate.

Accordingly, the Court denies Cargill summary judgment on the maritime negligence claim in Count IV.

II.    ACL'S MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges in Count V of the Complaint that the Barge was unseaworthy, and that ACL, as the Barge's owner, is liable for this breach of duty. ACL counters that the duty to provide a seaworthy vessel, discussed supra, does not extend to seamen who are not members of the vessel's crew.

ACL is entitled to summary judgment on the seaworthiness claim. As quoted above, "a Jones Act seaman, who possesses the full range of traditional seamen's rights and remedies, cannot maintain a [] seaworthiness action against a vessel on which he is not a crew member." Smith, 910 F.2d at 315. The undisputed material facts demonstrate that Plaintiff was not

employed by ACL: ACL's corporate counsel stated that ACL never employed Plaintiff, and Plaintiff himself testified at his deposition that he was employed by Lower Illinois, and was a member of the crew of the "Tom Edwards." He further stated that he had never been employed by ACL, and that he was not part of the Barge's crew.

Accordingly, ACL did not owe Plaintiff a warranty of seaworthiness, and the Court grants ACL summary judgment on Count V of the First Amended Complaint.

<u>CONCLUSION</u>

THEREFORE, Defendant Cargill Incorporated's Amended Motion for Summary Judgment (d/e 29) is GRANTED as to Count III of the First Amended Complaint, and DENIED as to Count IV of the First Amended Complaint. Defendants American Commercial Barge Line, LLC and American Commercial Lines, Inc.'s Motion for Summary Judgment as to Count V of Plaintiff's First Amended Complaint (d/e 33 and d/e 39) is GRANTED. Due to the facts that ACBL is defunct, and ACL is ACBL's successor in interest and has assumed all of ACBL's assets and liabilities, the Court dismisses ACBL from this suit. Counts I, II, IV, and VI remain for trial, which is scheduled to commence at 9:00 a.m. on April 6, 2010.

IT IS THEREFORE SO ORDERED.

ENTER:   February 11, 2010

      FOR THE COURT:

                                 _____ s/  Jeanne E. Scott_____
                                          JEANNE E. SCOTT
                         UNITED STATES DISTRICT JUDGE